MATTHEW SWERDLOFF AND ARLENE B. SWERDLOFF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Swerdloff v. Commissioner
Docket No. 7631-79.
United States Tax Court
T.C. Memo 1988-96; 1988 Tax Ct. Memo LEXIS 122; 55 T.C.M. (CCH) 307; T.C.M. (RIA) 88096; March 3, 1988. Matthew Swerdloff, pro se. John F. Dean, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Chief Judge: This case was assigned to Special Trial Judge Francis J. Cantrel pursuant to section 7456(c) (redesignated section 7443A by section 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755) and Rule 180 et seq. [1] After a review of the record, we agree with and adopt his opinion which is set forth hereinbelow. *126 OPINION OF THE SPECIAL TRIAL JUDGE CANTREL, Special Trial Judge: In his notice of deficiency respondent determined deficiencies in petitioners' Federal income tax and additions to the tax for the taxable calendar years 1971 through 1973 as follows: Additions to Tax, I.R.C. 1954
Years
Income Tax
[2]Section 6653 (b) 1971
$ 6,187.06 $ 3,093.53
1972
13,300.00
6,650.00  1973
13,861.00
6,931.00  The following adjustments to income were determined by respondent in his notice: 1971
1972
1973
Unreported Income
$ 12,885.87 * $ 29,773.19
* $ 16,777.91 Contributions
1,541.50 * 574.50
* 5,835.00 Partnership Income
2,166.70 -0-   -0-    Auto Expense
402.00 * 948.00
* 762.00 Entertainment
1,562.00 * 781.00
* 786.00 [3] Medical Expense 769.00 392.20
(46.80)
Interest
(177.94)
* 59.54
* 208.15 Unreported Fees
-0-    833.00 ** 4,200.00 Office-in-Home
-0-    * 135.00
* 385.00 Seminars
-0-    -0-   * 1,248.39 $ 19,149.13 $ 33,496.43
[4] $ 30,155.56 *127 After the concessions noted above, the issues for decision are: 1. Whether petitioners received unreported income in 1971 in the amount of $ 12,885.87. 2. Whether petitioners are entitled to claimed charitable deductions in 1971 of $ 1,541.50. 3. Whether petitioner's distributive share of the ordinary income of Swerdloff, Albert and Lasover, a partnership, is increased in the amount of $ 2,166.70 in 1971 as a result of adjustments made to the partnership's income. 4. Whether petitioners are entitled to claimed automobile expenses in 1971 in the amount of $ 402.00. 5. Whether petitioners are entitled to claimed entertainment expenses in 1971 of $ 1,562.00. *128 6. Whether petitioners received income from unreported fees in 1972 and 1973 in the respective amounts of $ 833.00 and $ 1,100.00. 7. Whether petitioner, Arlene B. Swerdloff (hereinafter sometimes called "Ms. Swerdloff"), is entitled to relief, as an innocent spouse, from income tax due on the 1971, 1972 and 1973 joint Federal income tax returns filed by petitioners. 8. Whether a part of the underpayment of income tax in each of the years 1971 through 1973 is due to the fraud of petitioner. [5]
9. Whether all or any portion of the testimony of Stanley J. Bomstein is inadmissable. FINDINGS OF FACT Petitioners resided at 55 Penny Lane, Baltimore, Maryland on the date they filed their petition herein. They filed joint 1971, 1972 and 1973 Federal income tax returns (hereinafter "return" or "returns") with the Director, Internal Revenue *129 Service Center, Philadelphia, Pennsylvania. Throughout the years at issue petitioners were married and living together as husband and wife. Prior to, during and after the years herein involved, petitioner was a practicing attorney licensed in the State of Maryland. During part of 1971 he was engaged in the practice of law as a partner in the partnership of Swerdloff, Albert and Lasover. In August of that year that partnership was dissolved and the partnership of Swerdloff, Rabineau and Murphy was formed. Petitioner engaged in the practice of law as a partner in said latter partnership during the balance of 1971 and in 1972 and 1973. He signed the partnership returns (U.S. Partnership Return of Income) for the years 1972 and 1973. Ms. Swerdloff was employed during each of the years 1971, 1972 and 1973 by the University of Maryland. [6]
Unreported Income - Bank Deposits
Respondent considered the books and records submitted by petitioners to be incomplete and thus, unreliable sources for determining the correct amounts of *130 income and expense for the years before the Court. [7] He, therefore, determined petitioners' unreported income by the bank deposits method. Ms. Swerdloff received wage income from the University of Maryland in 1971, 1972 and 1973 in the amounts of $ 2,845.00, $ 3,277.00 and $ 1,649.00, respectively. In 1971, Ms. Swerdloff maintained checking account number XXX-X054-4 at the Equitable Trust Bank ("Equitable Trust") in Baltimore, Maryland and during that year she made deposits in that account approximating $ 7,000.00. [8]
On October 13, 1971, Ms. Swerdloff opened checking account number XXX-X880-3 at Equitable Trust. From *131 the date she opened that account through December 13, 1971 she deposited $ 2,790.00 in that account. During 1972 and 1973, she made deposits in this account in the amounts of $ 16,502.61 and $ 23,587.51, respectively. Petitioner, during the years 1971 through 1973, maintained checking account number XXX-X4283 at the Union Trust Bank ("Union Trust account") and checking account number 7951179 at the First National Bank ("FNB account"). Both banks are located in Baltimore, Maryland. [9] During 1971, petitioner made deposits in his Union Trust account and FNB account in the respective amounts of $ 57,841.92 and $ 8,472.04. Petitioners received unreported income in 1971 determined as follows: Total Bank Deposits
$ 66,313.96 Less: Loan proceeds deposited  (9,400.00)
Union Trust checks redeposited        (5,698.00)
Gross income per return        (38,330.09)
Unreported income
[10] $ 12,885.87 *132 Contributions
Petitioners deducted the following contributions on their 1971 return: Organization
Amount
Temple
$ 375.00  Swerdloff, Albert & Lasover,
Partnership   120.00
Assoc. Jewish Charities
250.00
Israel Emerg. Fund
200.00
Univ. of Baltimore
250.00
Ted Levin Memorial Fund
36.00
B'Nai Brith
100.00
LAcrosse Hall of Fame
650.00
Chestnut Firemen
50.00
Owings Mill Firemen
25.00
ACLU
10.00
Cornell University
100.00
Misc. Organized Charities
113.00
$ 2,279.00
Respondent disallowed $ 1,541.50 of the amount claimed for contributions for failure to establish that the amounts disallowed were expended for the purpose designated and were allowable under section 170.
Partnership Income
In 1971 petitioner received taxable income from the partnership of Swerdloff, Albert and Lasover in the amount of $ 22,542.00, which was reported on petitioners' 1971 return. In 1973, the partnership return was audited by the Internal Revenue Service and, as a result, the following adjustments were made to partnership income: Selling and entertainment
$ 3,346.00
Meetings and dinners
895.00
Parking
1,389.00
Employee benefits
870.12
[11] $ 6,500.12
*133 Respondent determined that petitioner's distributive share of the additional partnership ordinary income is $ 2,166.70.
Automobile Expense
Petitioners deducted $ 1,038.00 for automobile expenses on their 1971 return. [12] Respondent allowed $ 636.00, which said amount had been allowed in a prior year, and disallowed $ 402.00 for failure to establish that the amount disallowed constituted an ordinary and necessary business expense and, if expended, was expended for the purpose designated. Entertainment Expenses
Petitioners deducted $ 1,562.00 for entertainment expenses on their 1971 return. Respondent disallowed the entire amount for failure to establish that the amount disallowed constituted an ordinary and necessary business expense and, if expended, was expended for the purpose *134 designated within the intendment of sections 162(a) and 274.
Unreported Fee Income
During 1971, i.e., up to August of that year, Swerdloff, Albert and Lasover and, thereafter, for the balance of that year and throughout 1972 and 1973, Swerdloff, Rabineau and Murphy ("the partnership"), were on retainer as attorneys paid by Maryland Indemnity Insurance Company ("Maryland Indemnity") to represent their insureds against tort claims (accident) where law suits were filed. a. Howard G. Reamer
In or about September 1971, Ralph Staten and Christine Foskey filed an action in the Superior Court of Baltimore City against Margaret Bell, t/a G.I. Cab Company through their attorney Howard G. Reamer ("Reamer"). [13] By Letter of Transmittal dated September 23, 1971, Maryland Indemnity advised petitioner -- Attached herewith please find Declaration and Interrogatories in suit filed by Ralph Staten and Christine Foskey in Superior Court by Attorney Howard G. Reamer. Suit is filed in the total amount of $ 80,150.00. We attach complete copy of our file. Please do everything necessary to protect our interests, as well as those of the named insured. *135 In late June or early August 1972, petitioner received a check from Reamer respecting a settlement in the above-filed action in the amount of $ 583.00. In December 1972, petitioner received another check from Reamer in the amount of $ 250.00. These checks, totalling $ 833.00, were deposited to petitioner's checking account at FNB. [14] The amount represented by these checks was not reported on petitioners' 1972 return nor was it included as income on the 1972 return of the partnership. Respondent determined that petitioners received $ 833.00 in unreported fee income in 1972. b. Stanley J. Bomstein
Stanley J. Bomstein ("Bomstein") was an attorney who was admitted to practice in the State of Maryland in 1962. [15] He conducted his practice in Baltimore, Maryland until 1974, at which time he entered into a plea bargain agreement after taking a one count plea to a mail fraud charge in the United States District Court for the District of Maryland *136 ("District Court"). Part of that agreement was that he resign from practice, which he did, and part of the agreement was that he give testimony against petitioner in a criminal proceeding (to be discussed later herein), which he also did. In 1971, 1972 and 1973 Bomstein was in general practice with a majority of negligence cases. He was a plaintiff's attorney. Basically, his particular function was in handling settlements. Trial work was referred out to other attorneys. To settle a negligence case he would obtain all the medical and other expenses and negotiate with an insurance adjustor. If the case was past the adjustor stage, he would negotiate with the insurance company or the attorney who was representing it. Once a dollar amount was negotiated he would get a draft (check) from the insurance company and his clients would come into his office and endorse the draft and sign the settlement sheet. All of the settlement checks were deposited in an escrow account and all disbursements were made out of it to clients, doctors, etc., and to petitioner. During *137 1972 and 1973, Bomstein was involved in a number of accident cases, as the attorney for the plaintiffs, in which Maryland Indemnity was the carrier for the insured. In 95 percent of those cases it was necessary to file suit. Petitioner, whom Bomstein had known for some 20 years, both on a professional level and through various athletic endeavors, represented Maryland Indemnity in those cases. Bomstein also knew Reamer, whose practice was similar to Bomstein's and who maintained an office a couple of doors down from Bomstein's in the same building. At various times in 1971 and 1972 Bomstein and Reamer discussed cases which they had with Maryland Indemnity in which petitioner was its attorney. Additionally, they discussed mutual problems they were having with Maryland Indemnity. During these discussions Reamer informed Bomstein that there was an alternative way in which settlements could be handled. The alternative way was for Bomstein to inquire as to whether arrangements could be worked out to settle his cases directly with petitioner on a split-fee basis. In this regard, Reamer showed Bomstein the case file of a case Reamer had settled with petitioner which contained therein *138 a check payable to petitioner for one-half of Reamer's fee in that case. Sometime in 1972, after his discussions with Reamer, Bomstein called petitioner on the telephone to ascertain whether the latter would consider settling cases in suits in which they represented the parties under an arrangement such as petitioner had with Reamer. During this conversation Bomstein informed petitioner of the discussions he had had with Reamer. Bomstein was advised to come up to petitioner's office, which he did. During the discussions that took place in petitioner's office, petitioner was again informed by Bomstein of the latter's discussions with Reamer. At no time, either during the telephone conversation mentioned above or during the office meeting, did petitioner express surprise, question or deny any of the statements made by Bomstein concerning his discussions with Reamer. During this office meeting it was agreed that Bomstein would get the case files back from the other attorneys, rather than letting them handle those cases. It was further agreed that the cases would be prepared all the way, i.e., as if they were being readied for trial. In furtherance of the agreement, interrogatories *139 were to be filed and served and all medical and special expenses were to be ascertained so that petitioner would have a proper basis to evaluate a settlement. Finally, it was agreed that once a settlement was negotiated, Bomstein would pay petitioner 50 percent of his fee (Bomstein's) by check. Pursuant to their agreement, Bomstein mailed his check to petitioner for one-half of the fee for the first case settled by them. A day or so later petitioner called Bomstein on the telephone and told him that when he came into his office that morning the envelope had been opened and the materials contained therein were open on the desk for all to see and that he didn't want his partners to see that. Petitioner directed Bomstein to see to it that all future mailings were marked personal and confidential. During 1973 petitioner received at least 12 checks from Bomstein in accord with their fee-splitting agreement. [16] These checks (aggregating $ 3,100.00) or the proceeds therefrom were deposited to petitioner's checking account or accounts in 1973. None of the $ 3,100.00 was reported as income on petitioners' 1973 return nor was it included as income on the 1973 return of the partnership. *140 During the course of the audit of petitioners' 1973 return respondent's examining revenue agent, Nelson Magram ("Mr. Magram"), received from petitioners' representative, Mr. Sylvan Naron, C.P.A., a page which had the following information thereon: Legal Fees
Not firm connected    Special Consultation    [17] $ 4,200.00
Petitioners received an additional $ 1,100.00 in unreported fee income in 1973. No part of the $ 1,100.00 was reported as income on petitioners' 1973 return nor was it included as income on the 1973 return of the partnership.
Innocent Spouse
Petitioners, at paragraph 5.8 of their petition, allege that Mr. Swerdloff is an innocent spouse with *141 respect to any underpayments of tax for the years in issue.
Additions to Tax for Fraud
The books and records maintained by petitioners during 1971-1973 were incomplete and not reliable sources of data upon which petitioners' correct taxable income and tax liability could be determined for those years. As a result, respondent was compelled to issue administrative summonses to the banks in which petitioners maintained their checking accounts in order to determine the correct amount of income petitioners received. During the years 1971, 1972 and 1973 petitioners received unreported income in the amounts of $ 12,885.87, $ 29,773.19 and $ 16,777.91, respectively. Prior to, during and after the years involved herein, petitioner was a practicing attorney in the State of Maryland. During the years at dispute before the Court, he was engaged in the practice of law as a named partner in two partnerships, which said partnerships were on retainer as attorneys paid by Maryland Indemnity to represent their insureds against tort claims (accident) where law suits were filed. In 1972, he entered into a fee-splitting agreement with Bomstein whereby petitioner was to receive 50 percent of *142 Bomstein's fee in cases where they had negotiated a settlement. As a result of this agreement, petitioner received unreported fee income in 1973 in the amount of $ 3,100.00. During 1972, petitioner received unreported fee income of $ 833.00 and in 1973 he received additional unreported fee income aggregating $ 1,100.00. On November 20, 1974, petitioner was indicted by the Grand Jury for the District of Maryland on 11 counts of mail fraud in violation of title 18 U.S.C. sections 1341 and 1342 (1982. [18] By Order of the District Court dated February 19, 1975 the case was declared a mistrial on the ground that petitioner was physically incapable of continuing the trial. [19] Subsequently, petitioner was reindicted. [20] In the indictment, which contained 18 counts and which was filed in the District Court on July 23, 1975, the Grand Jury charges, in relevant part: COUNT XVIII
And the Grand Jury for the District of Maryland further charges: On or about the 15th day of April 1974, in the State and District of Maryland, MATTHEW SWERDLOFF, a resident of Baltimore County, Maryland, did willfully and knowingly make and subscribe a joint income tax return *143 for the year 1973, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which said joint income tax return for the year 1973 he did not believe to be true and correct as to every material matter in that the said joint income tax return for the year 1973 stated in a Statement that the total miscellaneous income of Matthew Swerdloff and his wife was $ 200.00, whereas, as he then and there well knew and believed, the total miscellaneous income of Matthew Swerdloff and his wife was at least $ 3,300, and in that the said joint income tax return for the year 1973 stated and represented that total adjusted gross income was $ 44,628, whereas, as he then and there well knew and believed, the total adjusted gross income was at least $ 47.728. [21]
26 U.S.C. [Sec.] 7206(1)
*144 On February 18, 1976, petitioner entered a plea of guilty to the charge contained in Count XVIII of the indictment. [22]The District Court in its Finding and Judgment filed on February 20, 1976 recites: "Defendant [petitioner] has been convicted as charged of the offense(s) of Count No. 18 - U.S.C., Title 26, Section 7206(1) - Fraud and False Statement on Income Tax Return." [23]
Petitioners' correct taxable income, the amount reported and the understatement for the years in issue are: 1971
1972
1973
Correct Taxable Income
$ 45,391.13
$ 56,690.43
[24] $ 58,025.65
Amount Reported
26,242.00
23,194.00
27,870.00
Understatement
$ 19,149.13
$ 33,496.43
$ 30,155.65
Petitioners' correct income tax liability, the amount reported and the underpayment for the years before the Court are: 1971
1972
1973
Correct Income Tax
Liability  $ 12,993.06
$ 19,212.00
* $ 21,696.00
Amount Reported
6,806.00
5,912.00
7,835.00
Underpayment
$ 6,187.06 $ 13,300.00
* $ 13,861.00
*145 ULTIMATE FINDINGS OF FACT Petitioners did not maintain complete books and records during 1971-1973 for the purpose of correctly determining their taxable income and income tax liability for those years. Petitioners received unreported income in 1971 in the amount of $ 12,885.87. Petitioners received $ 833.00 in unreported split-fee income in 1972 and $ 1,100.00 in additional unreported split-fee income in 1973. Petitioner's distributive share of additional partnership ordinary income in 1971 is $ 2,166.70. For the year 1971, petitioners are not entitled to deductions for contributions, automobile expense and entertainment in amounts greater than those allowed by respondent. Ms. Swerdloff is entitled to no relief as an innocent spouse for any of the years 1971, 1972 or 1973. Petitioners underpaid their joint income tax liability for each of the years 1971, 1972 and 1973. Part of the underpayment of tax for each of the years 1971, 1972 and 1973 is due to the fraud of petitioner. OPINION
*146 Unreported Income - Bank Deposits
Under section 6001 all taxpayers are required to keep sufficient records to enable respondent to determine their correct tax liability. In the absence of adequate books and records, the existence and amount of a taxpayer's income may be proven by any method that clearly reflects income. Sec. 446(b); Harper v. Commissioner,54 T.C. 1121, 1129 (1970). The bank deposits method has long been an accepted method of reconstructing income received. Estate of Mason v. Commissioner,64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977); Halle v. Commissioner,175 F.2d 500 (2d Cir. 1949), affg. 7 T.C. 245 (1946), cert. denied 338 U.S. 949 (1950). Bank deposits are prima facie evidence of the receipt of income. Estate of Hague v. Commissioner,132 F.2d 775, 777 (2d Cir. 1943), affg. 45 B.T.A. 104 (1941), cert. denied 318 U.S. 787 (1943). "Where a taxpayer has made numerous deposits in bank accounts, the sources or nature of which are not accounted for or recorded in books and records maintained by him, determinations *147 made by the Commissioner of income subject to tax on the basis of such deposits have been approved in many instances; and it has been repeatedly held that a presumption of correctness attaches to such determinations and that the taxpayer has the burden of overcoming such presumption." Harper v. Commissioner, supra at 1129; Reaves v. Commissioner,31 T.C. 690 (1958), affd. 295 F.2d 336 (5th Cir. 1961). [25] Use of the bank deposits method is proper even where the taxpayer keeps books and records which support his return as filed. Campbell v. Guetersloh,287 F.2d 878, 880 (5th Cir. 1961). Petitioners contend that respondent's use of the bank deposits method was improper, unwarranted, arbitrary and capricious. They submit that the records they maintained were sufficient to determine their correct tax liability for the years at *148 bar. The record is otherwise. None of the books and records supplied to respondent revealed the unreported income determined by respondent. As a consequence, respondent was compelled to serve administrative summonses on the banks in which petitioners maintained their checking accounts. In his analysis of those accounts, respondent eliminated all deposits deemed to be nontaxable. Petitioners have conceded the unreported income for 1972 and 1973 and they have not produced a scintilla of evidence to show that respondent's determination of unreported income for 1971 in the amount of $ 12,885.87 is incorrect. Indeed, the record indicates that respondent's determination may be too low. In attacking respondent's 1971 determination, petitioner introduced exhibit 50 at the start of the trial. This exhibit consists of 10 original bank statements for petitioner's Union Trust account (showing transactions from January 4, 1971 through October 26, 1971) and 2 original bank statements for his FNB account (showing transactions from October 8, 1971 through December 20, 1971). No bank statements were produced by petitioner for his Union Trust account for the months of November or December *149 of 1971. In making his determinations of unreported income for 1971, Mr. Magram considered all of the statements embraced in exhibit 50. In addition, he also considered the statement for petitioner's Union Trust account for December 1971. At trial, he testified that he missed a deposit of $ 385.73 recorded in that statement. Moreover, he testified that he never received a statement for the Union Trust account for November 1971. Consequently, any deposits made to that account in November 1971 would not be included in his determination. Furthermore, while the record shows that deposits aggregating some $ 9,790.00 were made in Ms. Swerdloff's accounts during 1971, whereas she received wage income during that year of only $ 2,845.00, no part of these deposits is included in respondent's determination. Based on the evidence in the record we find that petitioners received unreported income in the amount of $ 12,885.87 during 1971.
Contributions
Section 170(a) allows as a deduction any charitable contribution payment made in a taxable year, subject to limitations set forth in section 170(b). Petitioners claimed a deduction of $ 2,279.00 for charitable contributions on their *150 1971 return. Respondent disallowed $ 1,541.50 of the amount claimed. Petitioners have the burden of proving respondent's determination incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). With respect to deductions, taxpayers are required to maintain and present for examination books and records sufficient to establish their rights to the deductions claimed. New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934); sec. 6001. Petitioners produced no evidence respecting the items claimed which respondent disallowed. Respondent's determination, therefore, is sustained.
Partnership Income
Gross income includes a taxpayer's distributive share of partnership gross income. Sec. 61(a)(13). Respondent determined that petitioner's distributive share of the additional ordinary income of Swerdloff, Albert and Lassover is $ 2,166.70. Petitioners produced no evidence in this adjustment. Hence, respondent's determination is sustained. Welch v. Helvering, supra;Rule 142(a).
Automobile and Entertainment Expenses
Three conditions must be satisfied before a deduction will be allowed for a claimed business expense *151 under section 162(a). [26] It must be (1) incurred in carrying on a "trade or business," (2) "ordinary and necessary," and (3) "paid or incurred during the taxable year." Whether an expenditure qualifies as an ordinary and necessary expense incurred in a trade or business is an issue of fact. Commissioner v. Heininger,320 U.S. 467, 475 (1943). a. Automobile Expense
Under section 162(a) an employee or a self-employed individual may deduct the cost of operating an automobile to the extent it is used in a trade or business. Here, petitioners deducted $ 1,038.00 for automobile expenses on their 1971 return. Respondent allowed petitioners $ 636.00, which said amount had been allowed in the audit of a prior year, and disallowed $ 402.00 for lack of proof. Petitioners have produced no evidence to show they are entitled to the amount disallowed. Accordingly, we sustain respondent's determination. Welch v. Helvering, supra;Rule 142(a). *152 b. Entertainment Expenses
In order to be entitled to deduct entertainment expenses, petitioners must demonstrate that the requirements of Code sections 162 and 274 have been met. [27]Sanford v. Commissioner,50 T.C. 823 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969); Levine v. Commissioner,T.C. Memo. 1986-108. Section 162 allows a deduction for ordinary and necessary business expenses. Section 274, as seen, is a disallowance provision: it operates to disallow expenses which have been shown to be deductible under another provision of the Code if is requirements are not satisfied. Andress v. Commissioner,51 T.C. 863, 866 (1969), affd. per curiam 423 F.2d 679 (5th Cir. 1970). Since petitioners have produced no evidence to show that they are entitled to any portion of the $ 1,562.00 disallowed by respondent, we sustain the latter's determination. Unreported Fee Income
Gross income means all income from whatever source derived, including *153 fees. Sec. 61(a)(1). The record demonstrates beyond doubt that petitioners received unreported fee income in 1972 of $ 833.00 as well as additional unreported fee income in 1973 of $ 1,100.00. Respondent's determinations are sustained.
Innocent Spouse
Where a joint Federal income tax return is filed by a husband and wife, the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several. This simply means that each may be called upon to pay the entire amount of the tax even though one had little or no income. Sec. 6013(d)(3). However, section 6013(e) states: (e) Spouse Relieved of Liability In Certain Cases. -- (1) In General. -- Under regulations prescribed by the Secretary, if -- (A) a joint return had been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax [28] attributable to grossly erroneous items [29] of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable *154 to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement. [30]
Petitioners have the burden of proving that Ms. Swerdloff is entitled to relief and meets all the requirements of section 6013(e). Lessinger v. Commissioner,85 T.C. 824, 838 (1985), which was reviewed by the Court; Shea v. Commissioner,780 F.2d 561, 565 (6th Cir. 1986), *155 affg. on this point a Memorandum Opinion of this Court; Ratana v. Commissioner,662 F.2d 220, 224 (4th Cir. 1981), affg. on this point a Memorandum Opinion of this Court. [31] Moreover, that burden of proof cannot be carried by remaining silent. Sonnenborn v. Commissioner,57 T.C. 373, 382 (1971). Furthermore, we cannot assume that the testimony of a critical absentee witness would have been favorable to petitioners. [32] Indeed, the normal inference is that it would have been unfavorable. Sonnenborn v. Commissioner, supra at 383. While petitioners have raised this issue in their petition and they argue in their brief, without persuasion or citation, that we should grant the relief sought, they have wholly failed to prove that all the requirements for relief pursuant to section 6013(e) have been satisfied. Accordingly, Mr. Swerdloff is entitled to no relief *156 under section 6013(e).
Additions to Tax for Fraud
Section 6653(b), relating to fraud, provides in pertinent part -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * Fraud means actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Zell v. Commissioner,763 F.2d 1139, 1142-1143 (10th Cir. 1985), affg. a Memorandum Opinion of this Court; Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. "An allegation of fraud is a serious matter; it is never presumed and must be proved by clear and convincing evidence." United States v. Thompson,279 F.2d 165, 167 (10th Cir. 1960); Beaver v. Commissioner,55 T.C. 85, 92 (1970). We are not limited to respondent's affirmative evidence on this issue. Imburgia v. Commissioner,22 T.C. 1002, 1014 (1954). The existence of fraud is a question of fact to be determined upon consideration of the *157 entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Proof of fraud may depend to some extent upon circumstantial evidence, and may rest upon reasonable inferences properly drawn from the evidence of the record. Hooper v. United States,216 F.2d 684, 688 (10th Cir. 1954); Stone v. Commissioner,56 T.C. 213, 224 (1971). An intent to conceal or mislead may be inferred from the pattern of conduct. Spies v. United States,317 U.S. 492, 499 (1943). The mere failure to report income is not sufficient to establish fraud, Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court, and it may not be found under circumstances which at most create only suspicion. Carter v. Campbell,264 F.2d 930, 935 (5th Cir. 1959). However, a pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. Holland v. United States,348 U.S. 121, 137 (1954). *158 Respondent has the burden to prove fraud for each year by clear and convincing evidence. Rule 142(b) and sec. 7454(a). It is not necessary that he prove the precise amount of the underpayment resulting from fraud but only that any part is attributable to fraud. Estate of Beck v. Commissioner,56 T.C. 297, 362 (1971); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). Hence, it is incumbent upon respondent to establish that (1) there has been an underpayment of tax, and (2) the underpayment was due to fraud by the taxpayer. Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court. We think respondent has carried his burden. Petitioners have conceded that they received unreported income in 1972 and 1973 in the respective amounts of $ 29,773.19 and $ 16,777.91 as well as unreported fee income in 1973 in the amount of $ 3,100.00. In addition, we have found that petitioners received unreported income in 1971 of $ 12,885.87, unreported fee income in 1972 of $ 833.00 and additional unreported fee income in 1973 of $ 1,100.00. A consistent pattern of underreporting large amounts of *159 income is an indication of fraud. Holland v. United States, supra at 139. See Merritt v. Commissioner, supra at 487; Foster v. Commissioner,391 F.2d 727, 733 (4th Cir. 1968), affg. on this issue a Memorandum Opinion of this Court; and Shahadi v. Commissioner,266 F.2d 495, 501 (3d Cir. 1959), affg. 29 T.C. 1157 (1958). We have found that the books and records maintained by petitioners were incomplete and not reliable sources of data to correctly determine petitioners' taxable income for 1971 to 1973, inclusive. A failure to maintain adequate books and records is likewise a badge of fraud. Bradford v. Commissioner,796 F.2d 303, 307 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Lollis v. Commissioner,595 F.2d 1189, 1192 (9th Cir. 1979), affg. a Memorandum Opinion of this Court. In 1972, petitioner was engaged in a fee-splitting scheme with Reamer as a result of which he received $ 833.00 in unreported fee income. In that same year he entered into an identical scheme with Bomstein and as a consequence thereof he received at least $ 3,100.00 from him *160 in unreported fee income in 1973. The purpose of these unethical, clandestine devices was to deceive and cheat not only his client, Maryland Indemnity and its insureds and his law partners, but also his Government. This is further evidence of petitioner's fraudulent intent. With respect to the taxable year 1973, on February 20, 1976, the District Court, based on petitioner's guilty plea, entered its finding and judgment that petitioner "has been convicted as charged of the offense(s) of Count No. 18 - U.S.C., Title 26, Section 7206(1) - Fraud and False Statement on Income Tax Return." [33] "Of course, a conviction for willful falsification, under section 7206(1), while not dispositive [on the issue of intent to evade tax under section 6653(b)], will be one of the facts to be considered in a trial on the merits." Wright v. Commissioner,84 T.C. 636, 643-644 (1985), which was also reviewed by the Court. *161 In determining the presence of fraud we must consider the native equipment and the training and experience of the party charged. Iley v. Commissioner,19 T.C. 631, 635 (1952) and Plunkett v. Commissioner, supra at 303. This includes a party's educational background. Simms v. Commissioner,422 F.2d 340 (4th Cir. 1970), affg. a Memorandum Opinion of this Court, which involved a practicing lawyer; Drobny v. Commissioner,86 T.C. 1326 (1986), which involved a certified public accountant; and Panzitta v. Commissioner,T.C. Memo. 1986-279, which involved an individual who has graduated from college and law school. Here, petitioner is an intelligent and educated man, having practiced law for a number of years and undoubtedly was aware of the necessity of including all income for legal services on the income tax returns which he filed for the years at bar. Yet he failed to do so. Based upon the record as a whole, we think he knew exactly what he was doing in 1971, 1972 and 1973 and what he attempted to accomplish, which was the evasion of tax on substantial income in these years. See Nell v. Commissioner,T.C. Memo. 1986-246. *162 The substantial understatements of income on petitioners' 1971, 1972 and 1973 returns, petitioners' failure to keep adequate books and records and petitioner's conviction under section 7206(1), among other evidence, establish the required element of fraud on the part of petitioner Matthew Swerdloff, for each of the years before us. Respondent's determinations under section 6653(b) are sustained.
Other Matters
a. Evidentiary Dispute
The parties are at loggerheads over Bomstein's testimony at the trial of this case. [34] He was called as a witness by respondent and cross-examined by petitioner, who by his own admission is an experienced trial attorney. In the interest of saving time, we recall pertinent portions of his testimony here. Bomstein testified that petitioner, as a defendant's attorney on retainer by Maryland Indemnity representing its insureds, entered into a direct arrangement in 1972 to split fees with Bomstein, a plaintiff's attorney, in return for settling cases in which Maryland Indemnity was involved. *163 Bomstein also testified to certain extrajudicial statements by another attorney, Reamer, during 1972, which statements disclosed to Bomstein the evidence of a fee-splitting scheme between Reamer and petitioner during that year for the purpose of settling claims against Maryland Indemnity. [35] Bomstein additionally testified that when he called petitioner on the telephone to ascertain whether such an arrangement could be worked out between them, Bomstein told petitioner about his discussions with Reamer. Later, at his meeting with petitioner at the latter's office, Bomstein again mentioned his discussions with Reamer and at that time such an arrangement was, in fact, consummated. Finally, Bomstein testified that at no time, either during the telephone conversation or during the office meeting, did petitioner express surprise, question or deny any of the statements Bomstein made concerning his discussions with Reamer. Nor did petitioner express surprise, question or deny such statements when they were made by Bomstein at trial. As we understand petitioners' brief, they argue that Bomstein's entire testimony *164 is inadmissible hearsay and should be stricken from the record. Respondent, on the other hand, restricts his argument, and properly so, to Bomstein's testimony relating to the extrajudicial statements of Reamer. In so doing, he maintains that such testimony is admissible on two grounds. First, the testimony respecting Reamer's statements was not offered for the truth of those statements but for the purpose of showing Bomstein's state of mind when he contacted petitioner and, further, to explain Bomstein's reason for seeking such an arrangement with petitioner. Second, the testimony establishes that when Bomstein confronted petitioner with his knowledge of the scheme between petitioner and Reamer, petitioner failed to deny the existence of such scheme and, further, Bomstein left the meeting with petitioner having consummated an arrangement as to a kickback scheme between himself and petitioner. Hence, in such circumstance, the testimony can be offered to establish the truth of the matter asserted, that is, that Reamer and petitioner were engaged in a kickback scheme in 1972. We agree with the respondent. Rule 801(c), Federal Rules of Evidence ("F.R.E."), which defines hearsay, *165 states: (c) Hearsay. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Petitioner was personally confronted by Bomstein at trial. For petitioner to contend that Bomstein's testimony, insofar as it relates to the direct negotiations between them which resulted in a fee-splitting agreement, is inadmissible hearsay verges on the ludicrous. [36]
Federal courts have long held that the admission of extrajudicial statements to explain the subsequent conduct of the parties, to show a circumstance relevant to the proof of a material fact or for a purpose other than for the truth of the matter asserted are outside the scope of the hearsay exclusion rule. United States v. Grow,394 F.2d 182, 205 (4th Cir. 1968), cert. denied 393 U.S. 840 (1968); *166 Terry v. United States,51 F.2d 49, 52-53 (4th Cir. 1931). We next move to respondent's contention that Bomstein's testimony can be offered to establish the truth of the matter asserted, i.e., Reamer and petitioner were engaged in a kickback scheme in 1972. Rule 801(d), F.R.E., describes certain statements which are not hearsay. Included in this category are statements of which the party (accused) has manifested an adoption or belief in its truth. Rule 801(d)(2)(B), F.R.E.
"Pursuant to the general rule regarding adoptive admissions, evidence has generally been held admissible that an accusatory statement was made in the presence and hearing of an accused and that his response was such as to justify the inference that he agreed with, or 'adopted' the accusation. The response may be simple silence." C. McCormick, Evidence, sec. 161, at 353 (2d ed. 1972). Generally, the rule is that when a statement tending to damage a party is made in his presence and hearing and such statement is not denied, contradicted, or objected to by him, both the statement and the fact of his failure to deny are admissible as evidence of his acquiesence in its truth if made under *167 circumstances which would warrant the inference that he would naturally have contradicted it if he did not assent to its truth. Sparf v. United States,156 U.S. 51 (1895); and United States v. Adams,470 F.2d 249, 251 (10th Cir. 1972). Here, the tacit or adoptive exception to the hearsay rule sustains the admissibility of the controverted statements and the facts pertaining to petitioner's silence and lack of denial when confronted by Bomstein with the accusatory statements made by Reamer. In short, Bomstein accused petitioner, a practicing trial lawyer, of secretly accepting money for his own personal benefit in return for fraudulently settling claims against his client, Maryland Indemnity in 1972. Such an accusation, patently inconsistent with the duties of an attorney owes his client, would naturally warrant a denial or contradiction if untrue. However, petitioner did not deny or contradict those accusations at any time, even at trial. In fact, the subsequent agreement between Bomstein and petitioner strongly suggests that said accusations were true. b. Observations
Petitioner's testimony, in his case-in-chief, is found on some *168 three pages of the trial transcript. He was not cross-examined by respondent's counsel. His testimony was limited entirely to the introduction of the following exhibits: (1) Exhibit 50, discussed hereinbefore at pages 20-21, supra, the effect of which corroborated in part respondent's determination of unreported income for 1971. (2) Exhibit 51, which is a check reflecting a loan received by petitioner in 1971. Four thousand five hundred dollars from the proceeds of this check was deposited in one of petitioner's checking accounts in 1971. Respondent had given petitioners' credit for this deposit in the bank deposit determination for 1971. (3) Exhibit 52, which consists of four checks drawn on petitioner's Union Trust account and totalling $ 1,750.00. The checks were dated and signed by petitioner in 1971. They allegedly represented the payment of a loan from petitioner's mother who, according to petitioner, "was 81 years of age and unable to come to Court." We are not advised as to why she could not come to Court. Two of the checks are made payable to Anne Swerdloff and the other two are made payable to Anna Swerdloff. All of them are endorsed Anna Swerdloff. There *169 is no documentary evidence in the record of a loan agreement. In any event, petitioners do not mention this loan in their brief so we deem the matter abandoned. Finally, we address and answer the following meritless contentions raised in petitioners' brief -- (1) There is no evidence to support an allegation that the petitioners failed to report substantial income for each of the taxable years 1971, 1972 and 1973. This simply is not true. Petitioner, in open Court, conceded the correctness of respondent's determination of unreported income using the bank deposits method of income reconstruction for the years 1972 and 1973. In addition, there is ample evidence to support respondent's determination on this adjustment for 1971, as described hereinbefore. (2) Respondent's disallowance of the deductions claimed by petitioners do not represent a "pattern" for showing fraud with intent to evade tax. The short answer to this contention is that respondent does not rely on the disallowed deductions as a basis for his fraud determinations against petitioner. (3) That Ms. Swerdloff "is innocent as to any deficiencies as to fraud." Respondent has made no determination against Ms. *170 Swerdloff under section 6653(b). See n. 2, supra.
(4) That the Government has prevented the petitioners from fully presenting the testimony by withholding records of the petitioners that were essential to the issues in this case. There is no showing in this record that the United States Government ever failed to return any records to petitioners and, in particular, it has never been shown that respondent, the Commissioner of Internal Revenue, ever had the alleged records in his possession. In accord with the foregoing, Decision will be entered under Rule 155.
Appendix A
Ex. AY
Various Exhibits-Maryland
Settlement Sheets
Indemnity Drafts to Bomstein
Plaintiffs
Settlement
Agreed Atty. Fee
Amounts
1.
E. Williams
$ 600.00
$ 200.00
$ 600.00
2.
Morrison
1,650.00
500.00
1,650.00
3.
Howell
1,400.00
400.00
1,400.00
4.
R. Williams
2,100.00
700.00
2,100.00
5.
Corbin
2,400.00
800.00
2,400.00
6.
Coby
850.00
300.00
*    7.
Curbean
750.00
300.00
750.00
8.
Johnson
1,200.00
400.00
1,200.00
9.
Giles
1,325.00
400.00 ** 662.50
10.
Edmonds
650.00
225.00
650.00
11.
Hill
3,000.00
1,000.00
3,000.00
12.
Jones
3,000.00
1,000.00
3,000.00
$ 18,925.00
$ 6,225.00
$ 17,412.50
*171 Ex. 49-AW
Split-Fee Checks to Petitioner
Date
Amount
1.
E. Williams
1-15-73
$ 100.00
2.
Morrison
1-19-73 *** 275.00
3.
Howell
1-19-73
200.00
4.
R. Williams
3-14-73
350.00
5.
Corbin
3-14-73
400.00
6.
Coby
1-23-73
150.00
7.
Curbean
2-9-73 *** 125.00
8.
Johnson
2-12-73
200.00
9.
Giles
2-26-73
200.00
10.
Edmonds
1-23-73 *** 100.00
11.
Hill
6-26-73
500.00
12.
Jones
6-22-73
500.00
$ 3,100.00
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. ↩
2. The sec. 6653(b)↩ determinations apply only to Matthew Swerdloff (hereinafter sometimes referred to as petitioner). *. These adjustments were conceded at trial by petitioners. ** At trial, petitioners conceded that they received $ 3,100.00 in unreported fee income in 1973. ↩
3. These are automatic adjustments based upon petitioners' adjusted gross income as redetermined. Sec. 213. ↩
4. Respondent's total, per his deficiency notice, is $ 30,254.65, a difference of $ 99.00. Taxable income determined by respondent for 1973 should have been $ 58,025.65, not $ 58,124.65. Hence, a computation under Rule 155 is required. ↩
5. Petitioners also raised the statute of limitations in their petition (see Rule 39). However, the parties have stipulated that the period for assessment and collection of income tax due for the years at bar was duly and validly extended to a date which is beyond the date the notice of deficiency herein was mailed to petitioners. ↩
6. We note that the 1971 and 1972 returns report her occupation as "housewife" whereas the 1973 return reports her occupation as "teacher."↩
7. As a result, in order to correctly determine unreported income, respondent was compelled to issue administrative summonses to obtain records from the various banks where petitioners had accounts. ↩
8. The Exhibit (17-Q), reflecting the bank statements for this account is illegible in parts. We have considered only those deposits we are certain of. Additional deposits were, in fact, made but it is impossible to determine the precise amounts thereof. Further, it appears that no transactions were entered in that account after November 15, 1971. ↩
9. Petitioner maintained these two accounts throughout 1972 and 1973. We need not mention here the transactions to these accounts for those years since, as indicated hereinbefore, petitioner has conceded that he received the unreported income in those years, determined by the bank deposits method, in the respective amounts of $ 29,773.19 and $ 16,777.91. ↩
10. We observe that respondent did not consider the deposits made to Ms. Swerdloff's checking accounts in 1971 in making his determination. Moreover, he did not consider the deposits made to her checking account in 1972 and 1973 in making his determinations for those years. Likewise, we have not considered those deposits in making our finding above.↩
11. The total partnership adjustment was agreed to and the distributive share of each of the other two partners was included in their 1971 income and their cases were closed out. Petitioner's distributive share remained open because of the other adjustments pending in this case. ↩
12. Petitioners reported business use of the automobile to be 8,650 miles at $ .12 a mile.↩
13. Reamer was not a witness at the trial of this case. ↩
14. Copies of these checks payable to and endorsed by petitioner are in the record. (See Exhibits 47-AU and 48-AV.) None of the $ 833.00 is included in the 1972 unreported income figure of $ 29,773.19 (see p. 2, supra↩). 15. Bomstein did testify at the trial pursuant to a subpoena served upon him by a representative of respondent. ↩
16. In the interest of completeness, see Appendix A, attached to this Opinion, which sets forth the details respecting these split-fee checks. Copies of the checks, each made payable to and endorsed by petitioner, are in this record. ↩
17. As noted earlier herein, petitioners have conceded $ 3,100.00 of this amount. Further, in the interest of clarity, we point out that no part of the $ 4,200.00 is included in the 1973 unreported income figure of $ 16,777.91 (see p. 2, supra.↩) 18. United States v. Matthew Swerdloff,↩ Criminal No. M-74-0717. 19. This was the trial at which Bomstein testified. ↩
20. United States v. Matthew Swerdloff,↩ Criminal No. M-75-0556. 21. Petitioners did report miscellaneous income of $ 200.00 on their 1973 return. We observe that the difference between the miscellaneous income reported by petitioners on their 1973 return and that which petitioner pled guilty to is $ 3,100.00. See Appendix A. Moreover, while petitioner did not plead to COUNT XVII of the indictment, we note that it is charged therein that petitioners received at least $ 2,863.00 in miscellaneous income in 1972, whereas, they reported only $ 2,030.00 on their 1972 return. The difference is $ 833.00. See p. 9, supra.↩
22. Petitioner was represented by counsel at the time of this plea. ↩
23. The District Court in adjudging petitioner guilty as charged and convicted, ordered that he be committed to the custody of the Attorney General for imprisonment. ↩
24. See n. 4, supra.↩
*. These are the amounts as determined by respondent in his notice of deficiency. Each such amount is overstated by the amount of tax on $ 99.00. See n. 4, supra.↩
25. See also O'Dwyer v. Commissioner,266 F.2d 575, 588 (4th Cir. 1959), affg. 28 T.C. 698 (1957), cert. denied 361 U.S. 862↩ (1959). We observe that venue on appeal of this case lies in the United States Court of Appeals for the Fourth Circuit. 26. Sec. 162(a)↩, reads in relevant part: "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *." 27. Sec. 274↩ is titled "Disallowance of Certain Entertainment etc., Expenses" and subpart (d) thereof provides stringent substantiation requirements.
28. A "substantial understatement" is defined in sec. 6013(e)(3)↩ as any understatement which exceeds $ 500.00. 29. "Grossly erroneous items" are defined in sec. 6013(e)(2)(A) and (B)↩ as "any item of gross income attributable to such spouse which is omitted from gross income" and "any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact or law." 30. Sec. 6013(e)↩ was amended in 1984 retroactive to all years to which the Internal Revenue Code of 1954 applies. Sec. 424(a), Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 801. 31. See also Mayworm v. Commissioner,T.C. Memo. 1987-536 and Bell v. Commissioner,T.C. Memo. 1987-501↩. 32. Mr. Swerdloff was the only witness to testify on behalf of petitioners at trial and he presented no testimony on this matter. ↩
33. Sec. 7206 provide, in relevant part -- Any person who -- (1) Declaration under penalties of perjury. -- Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; * * * * * * shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $ 5,000, or imprisoned not more than 3 years, or both, together with the costs of prosecution. ↩
34. This dispute does not affect the unreported income issue for 1971. Moreover, it would not change our decision respecting the fraud additions to the tax for 1971-1973 if this matter were decided for petitioners. ↩
35. Petitioner strenuously objected to this testimony at trial. ↩
36. Moreover, Bomstein's testimony is amply corroborated in the record. Petitioner has stipulated that during 1973 he received 12 checks from Bomstein totalling $ 3,100.00. Further, his guilty plea to Count XVIII of the Indictment confirms that the $ 3,100.00 was not reported on his 1973 return. ↩
*. There is no draft in the record for this case. ** There is no explanation in the record as to why the draft is only one-half of the agreed settlement. *** There is no explanation in the record as to why these checks are not one-half of the agreed attorney fee. ↩